**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CVETANKA KIROSKA-HARTMAN,**

        **Petitioner,**

v.                                                                      Case No: 8:23-cv-2974-MSS-CPT

**MATTHEW TODD HARTMAN,**

        **Respondent.**
-------------------------------------------------------=,

**Pro se DEFENDANT'S ANSWER TO THE VERIFIED PETITION UNDER THE HAGUE CONVENTION**

## I. The Parties Filing This Answer to the Complaint

| | |
|---|---|
| Name | Matthew Todd Hartman |
| Street Address | 215 Valencia Blvd. Condo 113 |
| City and County | Belleair Bluffs |
| State and Zip Code | Florida, 33770 |
| Telephone Number | (727) 266-9246 |
| E-mail Address | hartman.matthew@gmail.com |

## I. OPENING REMARKS

This answer is in response to the Verified Petition filed by Cvetanka Kiroska Hartman (the "Mother"), hereinafter referred to as the Petitioner. In the introductory section of the Petition, several general statements are made which Dr. Matthew T. Hartman (the "Father"), hereinafter referred to as 'the Respondent,' contends are **misleading representations** of the facts. This Answer seeks to clarify these misrepresentations before addressing the numbered allegations.

The Respondent **acknowledges** that this case is brought under the Hague Convention, as applicable through relevant U.S. laws including the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 et seq. However, the Respondent does not acknowledge wrongful removal.

**Following this preliminary clarification, the Respondent will address each of the numbered paragraphs in the Petition in turn.**

The Respondent categorically refutes the Petitioner's assertions regarding the children's residence and care. Contrary to the claims, the boys resided with both parents in Germany for the last 10 years. In fact, it is arguably the Respondent who acted as primary caregiver during this period. The portrayal of the mother as the sole family caregiver in Germany is false and is hereby **DENIED**.

Also **denied** is the assertion that the boys were removed to Florida in violation of custody orders and injunctions of the German family court is also incorrect. The German family court has not exercised exclusive jurisdiction over the custody of the boys in the manner described by the Petitioner. Petitioner and the Defendant have exercised joint custody.

That there is cause for a motion to **expedite** the return of the boys does not correlate with the facts of the case. The D.H. and K.H. have experienced stability and a sense of security in Florida, as evidenced by their uninterrupted schooling and adjustment, which speaks to their best interests. Moreover, the Petitioner's delay in seeking their

return undermines the claimed urgency, suggesting that an expedited judicial resolution may not be necessary or in the children's best interests.

## II. ENUMERATED RESPONSES TO THE COMPLAINT

### i. INTRODUCTION:

1. **DENY:** The defendant categorically denies the allegations made by the Petitioner, including the claim of abduction, the portrayal of my employment and financial status, and the assertion of being unfit as a parent. These characterizations are not only factually incorrect but also fail to accurately represent the nature of my relationship with our children and their wellbeing. I am committed to addressing these matters factually and respectfully in this court, focusing on the legal criteria relevant under the Hague Convention.

2. **DENY:** In light of the key principles established in cases such as Monasky v. Taglieri, 140 S. Ct. 719 (2020) and Friedrich v. Friedrich, 983 F.2d 1396 (6th Cir. 1993), it is essential to consider the totality of the circumstances in determining the habitual residence of our children. Our sons have always perceived the United States, specifically Florida, as their true home, viewing their time in Germany merely as akin to a study abroad experience due to my employment there. Their cultural, social, and linguistic ties are firmly rooted in the United States. This perception aligns with the importance of a child's acclimatization and social environment, as highlighted in Baxter v. Baxter [2001] EWCA Civ 480 and Mercredi v. Chaffe (C-497/10 PPU), [2010] ECR I-14309. Furthermore, their reluctance to move to North Macedonia, stemming from language barriers, perceived instability, and personal fears, further supports the assertion that their

habitual residence is not Germany, but rather the United States. Therefore, the petition under the Hague Convention based on an alleged habitual residence in Germany does not accurately reflect the realities of the boys' lives and their established connections.

## JURISDICTION AND VENUE

3. **LACK OF KNOWLEDGE**:

4. **LACK OF KNOWLEDGE**

5. **LACK OF KNOWLEDGE**

## THE HAGUE CONVENTION

6. **; 7.; 8.; 9.; 10.; 11.; ADMIT IN PART:**

   a) My extensive review of both primary and secondary sources related to the Hague Convention on the Civil Aspects of International Child Abduction has led me to question the effectiveness of its application. Scholarly discussions and proposed reforms highlight concerns that the Convention's procedures sometimes result in the mechanical return of minors to a designated 'habitual residence,' without adequately addressing the specific needs and welfare of the children and their parents involved.

   b) Even with the implementation of protective measures, mirror orders, and carefully crafted conditions of return, there appears to be a discernible low success rate in ensuring the safety and welfare of the minors. This is evidenced in cases like Golan v. Saada, 596 U.S. (2022), where despite the court's recognition of the 'grave risk of harm' to the child, the return was ordered under the assumption of protective measures.

   c) This case underscores a critical aspect of the Convention – while it does not aim to resolve custody disputes or establish jurisdictional boundaries, it

implicitly acknowledges the paramount importance of the child's welfare and safety.

d) The Convention's framework, while primarily legalistic, can be viewed as an instrument of child protection, suggesting that the rule of law is an ameliorative measure to mitigate the risk of harm to children involved in international custody disputes. It is not merely about legal mechanisms, but fundamentally about the protection and welfare of minors. This perspective resonates with a structured sense of liberty, emphasizing the importance of considering the future and welfare of the minors involved.

e) Hence, while the Convention provides a structured approach to international child abduction, it inherently calls for a nuanced application that prioritizes the safety and well-being of children above procedural formalities."

## FACTUAL BACKGROUND

A. **The Mother and the father move to Germany.**

12. **ADMIT**

13. **ADMIT IN PART:** Both sons are U.S. citizens. Because North Macedonia (NM) exercises the *Jus sanguinis* principle of nationality, both K.H. and D.H. have a legal right to apply for NM passports. The same applies to the Petitioner's Bulgarian status. Both boys could also acquire Bulgarian citizenship via the Petitioner.

14. **ADMIT IN PART:** We moved to Germany (cf., "#2" above), in 2013. Up to that time I had never taught expect as a graduate student at the Johns Hopkins University, where I held Graduate Teaching Assistantships while earning my Ph.D. To my knowledge I am the first academic to hold a full professorship at Schiller International University and was not fired, a point I will elaborate.

I enjoyed rich networks of friends, all of whom well knew K.H. and D.H.

B. **The Mother and Father separate and the Father threatens to move with the children to the United States. DENY!**

15.     **DENY:** cf., witness statements, affidavits, and sundry correspondence. There was no burden to speak of as responsibility.

16.     **DENY:** There was neither substance abuse nor infidelity on my part in 2013.

17.     **DENY:** My intention has never been to prolong her marriage but always to protect the children.

18.     **DENY:** the Petitioner and Respondent separated in the spring of 2018 but maintained a house together for D.H. and K.H.

19.     **ADMIT IN PART:** Affidavits and correspondence with relevant institutions. There was no more discussion of "contact rights" than there was of "custody" agreements. We had joint custody from the outset and shared visitation rights.

20.     **STRONGLY DENY:** the Petitioner possessed a Green Card and was a candidate for U.S. citizenship.

21.     **ADMIT IN PART:** The Petitioner moved out, as agreed. The Respondent accepted this with regards to K.H. and D.H. on the assumption he would see them often. They lived 5 minutes away by foot and visited him regularly. This was not a custody issue but one of time sharing.

22.     **LACK OF KNOWLEDGE:** It is true, however, that my employers were annoyed that I frequently had to interrupt my seminars to pick up sick children who would sit in the back of the lecture hall and listen. Principals and teachers often complained, even to the boys, that the Petitioner could rarely be reached.

23. **ADMIT IN PART:** As I recall I petitioned in November of 2019.

24. **DENY:** We always had equal custody. I was seeking to realize the equal time sharing which we already practiced.

25. **DENY:** We always had equal custody.

26. **DENY**

27. **LACK OF KNOWLEDGE**

28. **DENY**

29. **DENY**

30. **DENY:** Photos are selective, and the house was entered after the Defendant's departure. The Defendant has photos from the same time which reflect a different reality, and they will be submitted as exhibits.

31. **DENY:** This is demonstratively untrue.

32. **LACK OF KNOWLEDGE:** These details and allegation must be confirmed with D.H. and K.H. The Hague convention does not foresee silencing the voices of minors.

33. **LACK OF KNOWLEDGE:** ibid., in so far as the only witnesses with potentially valid information are not allowed to speak.

34. **DENY:** There was no evidence of a massive conflict of loyalties even if there was some evidence of misunderstanding and jealousy on of the Petitioner's part. I will provide correspondence, affidavits, witness testimony, and photographic evidence.

35. **ADMIT**

36. **DENY:** I was never officially requested to surrender passports.

37. **DENY:** This represents the position of opposing counsel. There was no proper ruling. The judge adjourned for a date after the August holidays. Evidence forthcoming.

38. **DENY:** I deny emphatically, because I can produce evidence to the contrary.

39. **ADMIT IN PART:** cf. correspondence.

40. **LACK OF KNOWLEDGE**

41. **ADMIT IN PART:** I did not abduct the boys. There was confusion, and as an email from her from August shows, she had refused to give me access to her contact details or blocked me access. I could not reach her, nor could the boys (cf., exhibits).

42. **DENY**: The Defendant only expected the boys back Monday, 28 August. We emailed and spoke that day. She was fully aware of their location.

43. **LACK OF KNOWLEDGE**

44. **ADMIT**

45. **ADMIT**

46. **LACK OF KNOWLEDGE**

47. **ADMIT**

48. **DENY**: On the contrary, I strongly encouraged communication (cf., correspondences, affidavits). The aggressive approach taken by the Petitioner and her family on a few phone calls noticeably offended K.H. and D.H., but I was not present during these phone calls, nor were members of my family.

49. **DENY**: The conversations are not monitored.

50. **DENY**: There is ample evidence to the contrary.

51. **ADMIT IN PART:** My family wishes to protect K.H. and D.H.

52. **DENY**

53. **DENY:** I spoke to the Family Court in Heidelberg and provided it with evidence. These facts will be displayed exhibits. **But it is important to note that this all took place well before the 26th of August**.

54. **DENY/LACK OF KNOWLEDGE:** A notice was delivered to our home; however, the notice was addressed to a Thomas Hartman. As evidence/exhibits will show,

the Post Office refused to provide me with whatever document was sent because it did not match the name on my driver licence. No further notices were delivered until the 29th of December, 2023.

55.     **ADMIT IN PART.** I cannot comment on the apartment, but I do know their friends and of their jovial social life when permitted to leave said apartment.

56.     **ADMIT IN PART:** 16 is the cut-off age for the applicability of the Convention to "minors," i.e., adolescent under the age of 18 in most UN member states. The Petitioner's claim that D.H. and K.H. "are well bellow the age threshold of the Hague Convention" is misguided. The Convention is only applicable – **including Article 13 (b)** – to minors under the age of 16.

57.     **DENY:** Article 13 (b) is explicit in not specifying an age threshold. D.H., 11 and K.H. a budding teen, represent exactly those minors whom the Convention sought to accommodate in the "Mature Objection" clause.

58.     **ADMIT IN PART**

59.     **AGREE IN PART.**

60.     **ADMIT IN PART:** Custody may now be in dispute in Heidelberg courts, but the Convention does not address custody.

61.     **ADMIT IN PART:** Custody was not the issue in the German Family Court. The issue was visitation, and it was largely interparental. The Petitioner sought to make it about custody, but it was always a visitation issue (cf., forthcoming exhibits).

62.     **ADMIT IN PART:** The Petitioner sought sole custody, which gave rise to these issues.

63.     **DENY**

64.     **ADMIT IN PART:** The mother did have sole custody.

65. **DENY:** *Mendez Lynch v. Mendez Lynch(* 2020 F. Supp. 2d 1347, 1359 (M.D. Florida. 2022.). This case applies to both parents.

66. **DENY**

67. **ADMIT IN PART**

68. **DENY: this position would void article 13(b) of the Convention.**

69. **ADMIT**

70. **ADMIT**

71. **ADMIT**

72. **LACK OF KNOWLEDGE.**

73. **ADMIT**

74. **LACK OF KNOWLEDGE**

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this answer: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the answer otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:     1-16-2024

Matthew T. Hartman, Ph.D.